UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

Ellis Wood,

                        Petitioner,          08-CV-4850 (CPS)

    - against -

                                             MEMORANDUM
Superintendent Robert Ercole,                OPINION
                                             AND ORDER
                        Defendant.

-------------------------------------X
SIFTON, Senior Judge.


        Ellis Wood ("petitioner" or "Wood") was convicted in

October, 2002 of first degree murder in New York Supreme Court,

Kings County. Petitioner is currently serving a life sentence

without parole. Petitioner brings this petition for habeas corpus

pursuant to 28 U.S.C. § 2254, seeking relief on the ground that

the admission at trial of his videotaped statement, allegedly

taken in violation of his Fifth and Fourteenth Amendment rights

to counsel and to remain silent, was not harmless error. For the

reasons stated below, petitioner's application is denied.


                        **BACKGROUND**

        The following facts are drawn from the parties' submissions

in connection with this motion and the record of petitioner's

state court proceedings.

**I. The Evidence at Trial**

        Petitioner was charged in State court with paying accomplice

Rasheen Harry ("Harry") to kill Carlisle Hall ("Hall"), a businessman who owned and operated a travel agency in Brooklyn, New York. Jurors heard accounts of Hall's murder principally from three sources. Accomplice Rasheen Harry's ("Harry") account was given through two written statements and one videotaped statement, each of which was admitted at trial,[1] and testimony at the trial, each of which offered a somewhat different version of events.[2] In each of his statements, Harry stated that Wood directed him to kill Hall, either by threatening Harry or offering him money to do it. Second, Wood's ex-girlfriend Nisha Bernard ("Bernard") testified at trial regarding her relationship to Wood and statements made by Wood to the effect that he was responsible for the murder. Third, a videotaped statement by Wood to police following his arrest was introduced, in which Wood admitted that he was present at the scene of the murder but claimed that he was not involved in it. There was significant overlap between Harry's testimony and Wood's statement, the crucial difference being the question of whether Wood paid Harry to kill Hall. The defense did not call any witnesses.

*Testimony of Bernard and Harry*

---

[1]Harry's two written statements were read into the record by a police officer who took the statements.

[2]The two written statements and the videotaped statement were taken on the same day, at 11:30 a.m., 3:30 p.m., and 5:30 p.m., respectively.

Bernard worked at the travel agency owned by Hall, whom she described as a "father figure" and friend. Bernard first met Wood when he came to the travel agency as a customer in 1998. Six months later, Wood and Bernard began a romantic relationship, during the course of which they had two children. In late 1999, Bernard left her job at Hall's travel agency in order to extricate herself from a fraudulent credit card scheme that was being run through the travel agency, in which Wood, Bernard, and others were involved.[3] In June, 2000, Bernard was questioned by federal agents about the scheme and gave information about Wood's involvement. No charges were brought against Bernard. In August, 2000, Bernard was arrested on a complaint of grand larceny by Hall relating to her handling of credit cards in the travel office. The charge was later dropped. In February, 2001, Bernard moved into Wood's home. The couple had frequent, heated arguments. Bernard's mother did not like Wood, and there were conflicts between Wood and Bernard's cousin.

Hall was murdered on June 2, 2001. On that day, according to Harry, Wood approached Harry on the street and asked him if he wanted to make some money. Wood said that a man had assaulted his girlfriend and that he wanted the man killed. Harry accompanied Wood to a location from which Wood retrieved a gun. Wood gave

_____

[3]It is not clear from the testimony whether Hall himself was involved in this scheme.

Harry $20, and agreed to pay Harry and additional $500 to kill

Hall.[4] The two drove in a green Lexus to the vicinity of Hall's

travel agency. Wood identified Hall as Hall walked down the

street with another man and entered the travel agency. Harry

followed and shot Hall twice in the chest as he sat at his desk

on the phone. After the shooting, Harry gave the gun to a friend

named Damion and returned by subway train to his house. Three

days after the shooting, Harry called Wood and asked for a loan.

Wood agreed, and Harry went to Wood's business to get the money.[5]

At various points over the ensuing weeks, Harry continued to ask

Wood for money, which Wood loaned to him.[6]

About three weeks later, Bernard and Wood had an argument

following a telephone call from Bernard's mother to Wood, during

---

[4]In his first written statement given to police, Harry stated that Wood offered him $300 to kill Hall, but he refused, saying that he just got out of jail. Harry claimed that it was Wood who entered the travel agency and shot Hall twice, after which Wood threw the gun into a black Honda. In his second written statement given to police, Harry stated that Wood offered him $500 and threatened to kill Harry's family if Harry did not agree to kill Hall, because Harry's uncle owed Wood $1500. In his videotaped statement, Harry claimed that Wood offered $500 and threatened to kill Harry and his mother and grandmother, because Harry owed him $1500. In the second written statement and in the videotaped statement, Harry stated that he initially refused to do the killing, but then carried out the murder out of fear. At trial, Harry testified that these statements were false.

[5]In his trial testimony, Harry stated that Wood loaned him $10 three days after the crime. In his second written statement, Harry stated that Wood promised to pay him $500 three days after the crime, but then refused to do so.

[6]In his second written statement, Harry claimed that Wood asked him if he would kill someone else for money following the murder of Hall, but Harry refused.

which Bernard's mother called Wood a murderer.[7] Wood told Bernard that if she revealed any information about him, he could get the same person that killed her friend to do the same thing to her or her family. Bernard then moved to her mother's home.

On July 4, 2001, Bernard took her children to see their father at Wood's apartment, at which time Wood and Bernard again spoke about Hall's shooting. Wood said that he had done things for Bernard for love and Bernard had never done anything for him. When Bernard asked what he meant, Wood told Bernard that he went to the travel agency with the man who did the shooting and pointed out Hall as he was entering the store with a colleague. Afterwards, Wood said that he parked outside the store in his green Lexus and watched as the shooter went into the store and shot Hall twice.

In mid-July, 2001, Bernard was with Wood when he received a telephone call from a man Wood identified as the shooter; the man wanted $75 from Wood. Bernard drove with Wood to meet this man at a store. Wood pointed out the man to Bernard, and she waited in the car.

Bernard waited for weeks to contact authorities after Wood discussed the murder, because she was frightened and reluctant to believe that Wood was responsible for the murder. On July 25th,

---

[7]Bernard testified to statements and actions by Wood following the murder.

however, Bernard contacted a federal agent whose information she had kept from the credit card investigation and asked to meet him. Bernard explained to two agents who met her what she had heard and seen regarding Wood's involvement in the murder. Bernard told the police Wood's address, and they took him into custody. On August 25th, Bernard was present at a line-up at the 71st Precinct, at which she identified Harry as the person she had seen meeting with Wood. While Wood was incarcerated before the trial, Bernard continued to visit him in jail, because she was afraid that he might hurt her or her family if he knew that she was helping the government.

*Statement of Ellis Wood*

Following his arrest, Wood gave a videotaped statement, which was received in evidence at trial and played for the jury. The following is Wood's account of the murder, as described in his statement.

Wood was driving in his green Lexus to buy marijuana when he saw Hall walking into the travel agency. A gray Honda pulled up along side his; the driver was a man named Damion, and the passenger was Harry. Wood pointed out Hall to Damion and Harry and said that Hall was the man with whom his girlfriend had a problem. Wood parked his car and walked around the corner to the store. Wood thereafter heard two gunshots. Wood immediately

returned to his car and drove to his business, where Harry and Damion later arrived. Wood sent Harry away and told Damion to stay away from Harry because he was crazy. Wood talked to Harry periodically after the shooting, and loaned him money at various times. The officer taking the statement asked if Wood had any problem with Hall following Hall's complaint alleging credit card fraud by Bernard, and Wood stated that he did not.

*Defense Discrediting of Testimony*

Although the defense did not put on a case, defense counsel attempted on cross-examination to discredit the testimony of the prosecution's witnesses.

During cross-examination of Harry, defense counsel elicited the fact that, on February 21, 2002, while awaiting trial, Harry executed an affidavit with assistance from Wood on Riker's Island, where both men were being held in the same building. In this affidavit, Harry stated that Wood had nothing to do with the crime, and further stated that Harry's videotaped statement had been made as a result of promises by the arresting officer and District Attorney. Defense counsel established that, at the time Harry executed the affidavit, Harry knew that there was a possibility the District Attorney would pursue the death penalty against him. On re-direct, Harry denied that his videotaped statement was the product of promises by the prosecutor or

police. Harry testified that Wood pressed him for weeks to help write the affidavit so Wood could clear his name and that Wood thought up most of the statements in the affidavit and told Harry to write them.

Defense counsel confronted Harry with his numerous failures to comply with court orders and his with commission of new crimes while he was on probation. Harry admitted that he was a member of the Bloods gang, which he joined during one of his stints in prison. Harry further admitted that he was convicted of distribution of crack and assaulting fellow inmates while in prison, and that he lied on the witness stand at his trial for drug distribution. Defense counsel asked Harry about his cooperation agreement, which was signed on July 29, 2002. Under the agreement, Harry was allowed to plead guilty to first degree murder, in exchange for a sentence of twenty years to life, with an assurance from the District Attorney that favorable statements would be made to the parole board on his behalf.

On cross-examination of Bernard, defense counsel established that Bernard had been told during her questioning about Hall's murder that her credit card fraud case might be reopened. Defense counsel elicited that Bernard knew that, as a green card holder, she could be deported if convicted of the fraud. Bernard testified that the credit cards were of no interest to her when she gave information about Wood's involvement with Hall's death.

Defense counsel additionally established that Bernard and Wood had frequent, heated arguments.

## II. Characterization of Testimony by Defense and Prosecution

In his closing statement, defense counsel spent considerable time arguing that Harry's testimony was not credible, given his conflicting statements, his prior convictions, and his motive to lie in order to take advantage of the cooperation agreement. Defense counsel reminded the jury that Bernard was not a first hand witness to anything, and pointed out Bernard's odd behavior in cooperating with the police while also maintaining her relationship with Wood, suggesting that Bernard did whatever was necessary to protect herself and get what she wanted, without concern for the truth. In addition, defense counsel played the video tape of Wood's statement for the jury.

The prosecutor began his closing statement by directing the jury to consider Wood's videotaped statement as a "series of very interesting admissions.... that should have sounded very, very familiar to you from the testimony of Rasheen Harry, and the testimony of Nisha Bernard." Tr. at 393. Save for the important detail of whose idea it was to kill Hall, Wood's videotaped statement corroborated Harry's testimony in the following respects: Wood admitted to being the scene of the crime and parking his green Lexus. Wood pointed out Hall to Harry as Hall

walked into the travel agency with another man, and described
Hall as a man who was causing problems for Bernard. Two shots
were fired, and Wood gave Harry $20. Mr. Hale reminded the jury
that Mr. Levine encouraged them to view Harry as a liar and asked
the jury, "Is he lying about any of those things? No. Mr. Wood
admits to knowing [Harry]. He admits to bringing [Harry] to that
store..., something [Harry] is also telling you. Again, Mr.
Harry, is he a liar? Is he making this up? No, it's confirmed by
this gentleman right here." Tr. at 396.

The prosecutor argued that it was not believable that Wood
pointed out Hall to Harry and gave Harry money for no reason.
Alluding to Wood's statement, the prosecutor stated that "his
explanations... when you start looking at them, why he said the
things that he said, they rise from admissions... into
confessions." Tr. at 403. It was Wood who had a motive to kill
Hall, to avoid further revelations about his involvement in the
credit card scheme. Harry did not know Hall and had no motive to
kill him if not for money; nor were his actions those of an
insane person. Harry's cooperation agreement was not a good
enough deal to cause him to falsely implicate Wood. Although
Harry's story changed during his different statements, the basic
fact that Wood offered Harry money to kill Hall remained the
same. The affidavit signed by Harry was clearly dictated by Wood,
and was done in a way that raised strong suspicions as to its

veracity. Turning to Bernard, her supposedly inconsistent actions made sense given her fear of Wood coupled with her confusion regarding his role in the murder.

## III. Jury Instructions

The trial judge instructed the jury that Harry was an accomplice as a matter of law and instructed the jury that in New York State, a defendant may not be convicted of any offense upon the testimony of an accomplice, "unsupported by corroborating evidence tending to connect the defendant with the commission of the crime." Tr. at 447-48. The judge then stated that there were only two potential sources of evidence that could meet the statutory corroboration requirement: Bernard's testimony concerning Wood's alleged admissions regarding his role in the killing and Wood's own videotaped statement. The judge instructed the jury that it could not consider the testimony given by Harry unless it found that Bernard's testimony or the videotaped statement tended to connect the defendant with the crime in such a way as to satisfy the jury that Harry had testified truthfully.

## IV. Procedural History

Petitioner was charged with one count each of Murder in the First Degree under N.Y. Penal Law § 125.27(1)(a)(vi) and Murder in the Second Degree under N.Y. Penal Law § 125.25(1).

Prior to trial, defense counsel sought to suppress petitioner's videotaped statement, arguing that the statement was taken following an unequivocal request for a lawyer, in violation of petitioner's Fifth and Fourteenth Amendment rights. Detective Arnao testified at the suppression hearing that petitioner stated to him, "I think I should get a lawyer." Transcript of Suppression Hearing at 37, 78. The detective responded, "Okay," and handed petitioner a telephone. *Id*. at 78-80. Petitioner did not thereafter call a lawyer. Subsequently, officers took a videotaped statement from him. The motion to suppress the statement was denied.[8]

Jury deliberations began on October 1, 2002. During deliberations, the jurors asked that Wood's videotaped statement be provided to them and that Bernard's testimony be read back. On the third day of deliberations, the jury returned a verdict convicting Wood of murder in the first degree. On November 13, 2002, petitioner was sentenced to a term of life imprisonment without the possibility of parole.

Petitioner appealed his judgment of conviction to the Appellate Division, Second Department. Petitioner made a number of claims on appeal, the relevant one here being that the trial court should have granted the motion to suppress his videotaped

---

[8]Justice Feldman ruled that the tape was admissible on September 19, 2002, and issued a written decision explaining his rationale on November 13, 2002.

statement because petitioner unequivocally invoked his right to
counsel, and should not have been further questioned without a
lawyer. Wood cited *Chapman v. California*, 386 U.S. 18; 87 S. Ct.
824; 17 L. Ed. 2d 705 (1967), for the proposition that the error
of admitting the videotaped statement was not "harmless beyond a
reasonable doubt," and argued that he was entitled to a new
trial. By decision and order dated May 1, 2007, the Appellate
Division unanimously affirmed petitioner's judgment of
conviction. *People v. Wood*, 40 A.D.3d 663; 835 N.Y.S.2d 414 (2d
Dept. 2007). The Appellate Division held that the hearing court
should have granted petitioner's motion to suppress his
videotaped statement because petitioner had invoked his right to
counsel. *Id*. at 664. However, it concluded that the error was
harmless, because the government had presented "overwhelming
evidence" of petitioner's guilt. *Id*.

Petitioner made a timely application for leave to appeal to
the New York Court of Appeals, pursuant to New York Criminal
Procedure Law § 460.20. In a letter supplementing his
application, dated July 11, 2007, petitioner argued that the
Appellate Division had not properly applied the harmless error
standard for federal constitutional errors set out in *Chapman v.
California* and *Fahy v. Connecticut*, 375 U.S. 85; 84 S.Ct. 229; 11
L. Ed. 2d 171 (1963). Judge Theodore Jones of the Court of
Appeals denied petitioner's application for leave to appeal on

September 7, 2007. *See People v. Wood*, 9 N.Y.3d 928 (2007).

Defendant made his application for habeas corpus review on November 25, 2008.

## DISCUSSION

### I. Statute of Limitations and Exhaustion

Court records establish, and respondent does not contest, that petitioner filed this application within the one year following the expiration of the time allowed for his direct appeals, as mandated by 28 U.S.C. § 2244(d).

Pursuant to 28 U.S.C. § 2254(b)(1), petitioner has properly exhausted all state remedies before pursuing his habeas claim. In a brief footnote to its memorandum in opposition, the government argues that, while petitioner argued in state court that the admission of his post-arrest statement was not harmless error, he did not specifically refer to the New York accomplice-corroboration statute that now forms part of his argument. The omission of the statute from petitioner's earlier briefs does not constitute a failure to exhaust his claims. In his brief to the Appellate Division, petitioner argued that his constitutional rights were violated and that the error was not harmless. Petitioner's failure on direct appeal to point out all of the reasons that an error was prejudicial is not an impediment to relief on a petition for a writ of habeas corpus, given the

court's duty "to examine the record as a whole" when evaluating
the harm arising from constitutional error. *Peck v. United
States*, 106 F.3d 450, 457 (2d Cir. 1997). Because petitioner
presented his harmless error claim to the state courts, his claim
has been exhausted and he may properly seek redress in federal
court.

## II. Standard for Habeas Review of Harmless Error

     Pursuant to the Antiterrorism and Effective Death Penalty
Act ("AEDPA"), passed in 1996, a court may not grant habeas
relief with respect to any claim adjudicated on the merits in
State court proceedings unless the decision below was contrary to
or an unreasonable application of clearly established Federal
law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).
Harmless error analysis on direct review is governed by *Chapman
v. California*, pursuant to which a court must determine whether a
constitutional trial error was "harmless beyond a reasonable
doubt;" if so, then a new trial is not required. 386 U.S. at 24.
Application of AEDPA in this case would require determining
whether the State courts unreasonably applied *Chapman* to find
that the error was harmless. However, the Supreme Court in *Fry v.
Pliler*, 127 S.Ct. 2321; 551 U.S. 112; 168 L. Ed. 2d 16 (2007),
has recently stated that a more stringent test for collateral
review of harmless error predating the passage of AEDPA

"subsumes" the AEDPA/*Chapman* test and therefore governs the
harmless error analysis in habeas cases. *Id.* at 2327. This test
requires a Court performing habeas review to assess whether a
federal constitutional violation "'had substantial and injurious
effect or influence in determining the jury's verdict.'"[9] *Brecht*
*v. Abrahamson*, 507 U.S. 619, 637; 113 S. Ct. 1710; 123 L. Ed. 2d
353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750,
776; 66 S.Ct. 1239; 90 L. Ed. 1557 (1946)).[10]

The *Brecht/Kotteakos* standard "requires a habeas court to
review the entire record *de novo* in determining whether the error
influenced the jury's deliberations; and leaves considerable
latitude for the exercise of judgment by federal courts." *Brecht*,
507 U.S. at 640-41 (Stevens, J., concurring). A reviewing court
should sustain a verdict only when it is "sure that the error did

---

[9]This standard is more forgiving than *Chapman*'s "harmless beyond a
reasonable doubt" standard. In *Fry*, the Supreme Court noted that concerns of
comity, finality and federalism justified a more deferential standard for
collateral review of state-court criminal judgments. *See* 127 S.Ct. at 2325.

[10]In *Zappulla v. New York*, 391 F.3d 462 (2d Cir. 2004), the Second
Circuit concluded, based on dictum in *Mitchell v. Esparza*, 540 U.S. 12; 124
S.Ct. 7; 157 L. Ed. 2d 263 (2003), that under AEDPA, *Brecht* had been
overruled, and the 'harmless beyond a reasonable doubt' standard set out in
*Chapman v. California* governed harmless error analysis on habeas review.
*Zappulla*, however, is no longer good law. In *Fry v. Pliler*, the Supreme Court
unanimously held that *Brecht*, not *Chapman*, applies in AEDPA cases performing
collateral review of state court application of harmless error analysis, even
though the state court must continue to apply *Chapman* on direct review. *See*
127 S.Ct. at 2326-27. The Court reasoned that, given that "AEDPA limited
rather than expanded the availability of habeas relief, it is implausible
that, without saying so, AEDPA replaced the *Brecht* standard... with the more
liberal AEDPA/*Chapman* standard which requires only that the state court's
harmless-beyond-a-reasonable-doubt determination be unreasonable. That said,
it certainly makes no sense to require formal application of *both* tests...
when the latter obviously subsumes the former." *Id.* at 2327.

not influence the jury, or had but very slight effect."
*Kotteakos*, 328 U.S. at 764. A reviewing court must focus on "what
effect the error had or reasonably may have had upon the jury's
decision. The crucial thing is the impact of the thing done wrong
on the minds of other [persons], not on one's own, in the total
setting." *Id.* The burden is on the government to show that the
erroneous admission was harmless. *See O'Neal v. McAninch*, 513
U.S. 432, 436; 115 S.Ct. 992, 994 (1995). Thus,

> if one cannot say, with fair assurance, after
> pondering all that happened without stripping the
> erroneous action from the whole, that the judgment was
> not substantially swayed by the error, it is
> impossible to conclude that substantial rights were
> not affected. The inquiry cannot be merely whether
> there was enough to support the result, apart from the
> phase affected by the error. It is rather, even so,
> whether the error itself had substantial influence. If
> so, or if one is left in grave doubt, the conviction
> cannot stand.

*Id.* at 765. "[T]he mere fact that the properly admitted evidence,
standing alone, would have been sufficient to support the
conviction is not determinative of whether the improperly
admitted evidence had a substantial and injurious effect." *Wray
v. Johnson*, 202 F.3d 515, 526 (2000) (quoting *Latine v. Mann*, 25
F.3d 1162, 1167-68 (2d Cir. 1994)) (internal citations omitted).

In assessing the importance of the wrongly admitted
evidence, a court should consider the following factors: (1) the
strength of the prosecution's case; (2) the prosecutor's conduct
with respect to the improperly admitted evidence, particularly

whether the prosecutor emphasized the evidence in arguments to the jury; (3) whether the testimony bore on a critical fact; and (4) whether the evidence was material to the establishment of that fact or whether it was instead corroborated and cumulative. *See id.; Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir. 2004).[11] The effect of petitioner's statement will be considered in light of the foregoing factors.

## III. Suppression of the Video Statement

As a preliminary matter, the government argues that the Appellate Division was incorrect to hold that the admission of the videotaped statement was error, and therefore the conviction must stand. Because the question of whether an error was harmless is moot if there was no error, I address this issue prior to application of the harmless error standard.

If a person in custody invokes his right to counsel, all questioning must cease. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) ("an accused... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

---

[11]*Wray* and *Zappulla* were recently cited with approval in *Pearson v. Ercole*, 2009 U.S. App. LEXIS 3227, at *2 (2d Cir. February 18, 2009) as discussing relevant factors for the harmless error analysis in habeas cases. The factors listed here are an amalgamation of the lists given in those two cases.

communication, exchanges, or conversations with the police."). In order to invoke the right to counsel, a person in custody "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459; 114 S.Ct. 2350; 129 L. Ed. 2d 362 (1994). If a person in custody "makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, judicial precedents do not require the cessation of questioning." *Id*.

Detective Arnao testified at petitioner's suppression hearing that petitioner stated to him, "I think I should get a lawyer." Transcript of Suppression Hearing at 37, 78. The detective responded, "Okay," and handed petitioner a telephone. *Id*. at 78-80. The fact that a member of law enforcement said "okay" and handed petitioner the phone indicates that the officer clearly understood petitioner's statement to be an unequivocal request for a lawyer. Detective Arnao did not indicate that he was confused by petitioner's statement or that he had to inquire further to understand whether petitioner really wanted a lawyer. In light of this, petitioner's request for a lawyer required the cessation of questioning. The Appellate Division correctly determined that the videotaped statement should have been

suppressed due to the violation of petitioner's constitutional rights.

The government argues that petitioner's words was not an unequivocal assertion of the right to counsel, because the words "I think" and "I should" qualified the statement, transforming it from a clear request for counsel into an equivocal remark, by which petitioner merely indicated that he might have been invoking his right to counsel. The government compares petitioner's statement to the phrases "maybe I should get a lawyer" (not an unequivocal invocation of the right to counsel, *Davis*, 512 U.S. at 454-56) and "I think I want a lawyer... do you think I need a lawyer?" (also not an invocation of the right to counsel). *Diaz v. Senkowski*, 76 F.2d 61, 63-63 (2d Cir. 1996). These cases do not stand for the propositions cited. In *Davis*, when the defendant stated "maybe I should talk to a layer," officers asked him whether he wanted a lawyer, and defendant replied that he did not want one. 512 U.S. at 455. In *Diaz*, the defendant first stated, "I think I want a lawyer," and when the officer indicated that he had not heard what the defendant had said, he stated, "do you think I need a lawyer?" 73 F.3d at 63. Given the officer's failure to hear the first statement, it was the second statement that was "operative" in the determination of whether there had been a request for counsel. 76 F.3d at 63, n.1. In this case, the request for a lawyer was unequivocal.

## IV. Harmless Error Analysis[12]

Petitioner claims that the admission of his statement "had substantial and injurious effect" in determining the jury's verdict. Petitioner argues that, had his statement been suppressed, there would not have been enough evidence to corroborate Harry's testimony, as is required under New York law for accomplices, and the verdict would have been substantially affected as a result. Petitioner further argues that even aside from the accomplice testimony issue, the jury would not have credited the testimony by Harry and Bernard without petitioner's statement to bolster it. I address the first contention having in mind the New York law on accomplice corroboration. I address the second contention by application of the four harmless error factors identified by the Court of Appeals in *Wray* and *Zappulla*.

## A. Accomplice Corroboration

New York's accomplice-corroboration requirement law provides, in relevant part, that:

1. A defendant may not be convicted of any offense upon

_____

[12]The government argues that because petitioner's statement was exculpatory, defense counsel argued its truth in summation, and defense counsel played the entire tape for the jury in summation, the statement had minimal value for the prosecution. This argument is not persuasive. Once the defense was stuck with the statement, it attempted to minimize its impact. Those minimizing attempts cannot now be held against petitioner. The finding that the introduction of the statement was harmless must rest on other grounds.

the testimony of an accomplice unsupported by
corroborative evidence tending to connect the defendant
with the commission of such offense.
2. An "accomplice" means a witness in a criminal action
who, according to evidence adduced in such action, may
reasonably be considered to have participated in:
     (a) The offense charged[.]

N.Y. C.L.S. C.P.L. § 60.22.

New York law "recognizes that accomplice testimony is inherently untrustworthy because those charged with a crime often seek to escape the consequences and curry favor with officials by implicating others." *People v. Sweet*, 78 N.Y.2d 263, 267; 577 N.E.2d 1030; 573 N.Y.S.2d 438 (1991). Corroboration is required to "protect the defendant against the risk of a motivated fabrication by insisting upon proof other than that alone which originates from a possibly self-interested accomplice." *Id*. (internal quotations omitted). "Corroborative evidence need not establish all the elements of the offense." *People v. Breland*, 83 N.Y.2d 286, 293; 631 N.E.2d 577; 609 N.Y.S.2d 571 (1994). "Seemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration." *Id*. at 292-93. The accomplice corroboration protection requires "only enough nonaccomplice evidence to assure that the accomplices have offered credible probative evidence.... The corroborative glue does not require independent proof of the elements of the crime to sustain a conviction; it just has to bind the accomplice evidence to the defendant." *Id*. at 293. So

long as the corroboration tends to connect the defendant with the crime, "it is for the jury to decide whether the corroboration satisfies them that the accomplice is telling the truth." *People v. Steinberg*, 79 N.Y.2d 673, 683; 595 N.E.2d 845; 584 N.Y.S.2d 770 (1992).

The trial judge stated that Harry was an accomplice, and instructed the jury that there were only two potential sources of evidence that could meet the statutory corroboration requirement: (1) Bernard's testimony concerning Wood's alleged admissions regarding his role in the killing; or, (2) Wood's own videotaped statement. Tr. at 448-9. Petitioner contends that Bernard's testimony was not credible enough to corroborate Harry's testimony. Petitioner's argument fails. Bernard's testimony was coherent and comprehensible, and defense counsel's attempts to portray Bernard as inconsistent were not successful.

Bernard testified that petitioner told Bernard that he did things for her for love, and then explained how he went to the travel agency with the man who shot Hall and pointed out Hall to the shooter, after which he waited outside while the shooter killed Hall. On another occasion, Bernard accompanied petitioner to a meeting with the shooter, after the shooter asked Wood for money. Bernard later correctly identified Harry as the shooter in a lineup. *Id*. at 269. This information is sufficient to connect petitioner to the crime and to indicate that Harry's testimony

was credible.

Petitioner argues that Bernard's testimony was not credible, and therefore the jury must have relied on petitioner's statement in order to corroborate Harry's testimony. Petitioner's argument that Bernard's testimony was biased and inconsistent rests on the following facts: the year before Hall was killed, Bernard provided petitioner's name to federal agents in connection with their investigation into the credit card scheme. She moved in with petitioner, but the couple had frequent heated arguments. Bernard provided information to investigators regarding petitioner's role in the murder, but afterwards passed Harry's affidavit to a defense investigator and did not tell law enforcement that she continued to visit petitioner in jail. These claims of bias are tenuous, and the supposed inconsistencies in Bernard's actions were fully explained by her testimony. The jury could certainly have decided that a year-old credit fraud case did not motivate Bernard to lie on the stand in order to wrongfully convict petitioner of first degree murder. Furthermore, Bernard's inconsistent actions in assisting law enforcement and supporting petitioner by visiting him in jail and acting as courier for Harry's affidavit are explained by her fear of revealing to petitioner that she was working against him in this case, after he had explicitly threatened her life and that of her family.

There is no good reason on the record for finding that Bernard's testimony was not credible. It is reasonable to assume that, had petitioner's statement not been admitted, the jury would still have considered Harry's accomplice testimony, based on Bernard's corroboration.

## B. Application of the Harmless Error Factors

Having determined that Harry's testimony would have been considered by the jury even without petitioner's statement, I proceed to determine whether the introduction of the statement had a substantial and injurious effect on the verdict, applying the harmless error factors as stated by the Court of Appeals in *Wray* and *Zappulla*.

## 1. Strength of the Prosecution's Case

The prosecution presented strong evidence that petitioner had hired Harry to kill Hall. Harry testified to the fact that defendant approached him and asked him to murder Hall in exchange for money. He described how petitioner was driving a green Lexus. Harry described how petitioner identified Hall as he walked down the street as the man who assaulted his girlfriend, after which petitioner gave Harry a loaded gun. Harry further described how petitioner gave him twenty dollars in exchange for the killing, and promised more in the future.

Harry's testimony was corroborated by Bernard, who described how petitioner threatened her life if she gave information about him in relation to the murder, how petitioner stated that he did things for her out of love in and then described the murder in detail, and how petitioner spoke to the shooter on the phone and drove to meet the shooter, whom he pointed out to Bernard before meeting to hand over money. Bernard subsequently identified Harry as the shooter in a lineup, a fact that lends much credibility to her account of her interactions with petitioner. Bernard testified that she was afraid of petitioner, which is supported by her decision to move out of petitioner's apartment following her conversation with Bernard about the murder in late June, 2001. Although Bernard did not testify that petitioner told her explicitly that he had hired someone to kill hall,[13] her testimony regarding petitioner's words and actions created a strong inference that petitioner was responsible for the murder.

The prosecutor presented a coherent and compelling narrative to the jury of how and why petitioner committed the crime, and why Bernard and Harry acted the way they did. There was no counter-narrative explaining why Harry would have killed without provocation and why Bernard would lie about her encounters with

---

[13]The government incorrectly states that Bernard testified that petitioner admitted to her, on three separate occasions, that he had hired someone to kill Hall, and further incorrectly states that petitioner identified Harry as the man he had paid to do the killing. There are no such statements in Bernard's trial testimony.

petitioner, or why those encounters were not what they seemed. The Prosecution's case was accordingly quite strong.

## 2. The Prosecutor's Treatment of Petitioner's Statement

The prosecution put petitioner's statement front and center in its closing argument, describing the testimony as a "series of very interesting admissions." Tr. at 393. However, the focus of the prosecutor's discussion of petitioner's statement was on rehabilitating Harry's trial testimony, which defense counsel spent a significant amount of time discrediting in his closing.[14] Harry's testimony could be trusted, argued the prosecution, because many of its details appeared in petitioner's statement. After a discussion of the similarities between petitioner's statement and Harry's testimony, the prosecutor discussed other strengths of the case and did not dwell on the statement for the bulk of the closing. He developed arguments as to why Harry had no motive to kill Hall, why the affidavit written by Harry was not trustworthy, why Bernard's testimony should be believed, and why covering up the credit card scheme was a clear motive for petitioner to commit murder.

---

[14]In his closing statement, defense counsel reminded the jury that Harry had given several conflicting statements, had a number of prior convictions, and had a strong motive to lie in order to receive a cooperation agreement from the government shortening his time in prison. Defense counsel emphasized that Harry was a liar and could not be trusted.

### 3. The Testimony Bore on a Critical Fact

Petitioner's videotaped statement clearly bore on a critical fact, as it placed petitioner at the scene of the murder, and showed that petitioner knew specific facts about the crime and the shooter.

### 4. The Evidence was Corroborative and Cumulative

The prosecution did not use petitioner's statement to establish any facts that were not already established through other testimony. Instead, the statement served to corroborate Harry's testimony, putting petitioner at the scene of the crime.

The cumulative nature of the statement is shown by the fact that the prosecution could have used other means to bolster Harry's testimony in its closing, as Bernard testified to several facts that matched up with Harry's testimony. Bernard testified that petitioner described Hall walking into the travel agency with another person, which Harry also stated. Bernard further testified that petitioner stated that he knew the shooter, and could have the shooter kill someone else if necessary. This is consistent with Harry's testimony that he and petitioner knew each other for several years, and the allegation in Harry's video statement that petitioner asked if he would be willing to kill another person. Last, Bernard testified that petitioner stated that the shooter was asking him for money, which is consistent

with Harry's statement that petitioner offered him money to kill
Hall. Any probative effect of petitioner's statement was merely
cumulative to the weight of that testimony.

Petitioner acknowledges that his statement was used as
corroboration, but states that this corroboration was key for the
success of the case. He maintains that, if his statement had not
been admitted, the prosecution would have been forced to rely
solely on Bernard's testimony to corroborate Harry's account, and
would have run a substantial risk that the jury would find
Bernard's testimony not credible enough to rely on it as
corroboration.  This argument fails, as previously discussed in
the context of accomplice corroboration.

## C. The Error Was Harmless

The introduction of petitioner's statement at trial did not
have a "substantial and injurious effect or influence" in
determining the jury's verdict. The testimony by co-defendant
Harry established the sequence of events leading up to the
murder, and the testimony by Bernard both corroborated that
version of events and indicated that petitioner had admitted to
the murder of Hall. Petitioner offered no explanation at trial
that could counter the weight of the combined testimony of Harry
and Bernard, or that could explain why Harry would kill with no
motive. Although the prosecution did rely on petitioner's

statement in its closing, had the statement been excluded, the prosecution could have presented the same narrative and arguments as to why petitioner committed the crime through the testimony of Bernard and Harry. It can reasonably be said, with fair assurance, that the judgment in this case was not substantially swayed by the introduction of petitioner's statement. Had the statement not been admitted, the jury would have reached the same verdict.

## CONCLUSION

For the reasons stated above, the petition for a writ of Habeas Corpus is denied. Petitioner is denied a certificate of appealability because petitioner has not made a substantial showing of the denial of a constitutional right. *See Reyes v. Keane*, 90 F.3d 676, 680 (2d Cir. 1996). The clerk is directed to transmit a copy of the within to all parties.


SO ORDERED.

Dated:     Brooklyn, New York
           June 9, 2009


                        By: /s/ Charles P. Sifton (electronically signed)
                              United States District Judge